UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| ELEUTIAN TECHNOLOGY, INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> - against - <br><br> SKYLAKE GLOBAL INCUVEST 1 PRIVATE INVESTMENTS SPECIALTY CO., LTD., a Korean corporation, SKYLAKE INCUVEST & CO., a Korean Corporation, CDI HOLDINGS, INC., a Korean corporation, CHUNGDAHM LEARNING, INC., a Korean Corporation, KEVIN CHOI, an individual, DAEJE CHIN, an individual, SUSAN CHIN, an individual, and MICHAEL KIM, an individual, <br><br> Defendants. | 11-CV-08-D <br><br><br> **AFFIDAVIT OF <br> SEUNGWOO KEVIN CHOI** |

SEUNGWOO KEVIN CHOI, pursuant to 28 U.S.C. § 1746, states as follows:

1.      I am the Managing Director of defendant Skylake Incuvest & Co. ("Skylake"), as well as an individual named defendant in the above-captioned action. I make this affidavit in opposition to the motion of plaintiff Eleutian Technology, Inc. ("Eleutian Technology") for a preliminary injunction and in favor of defendants' motion to compel arbitration. I am a Korean national who lives and works in Seoul, Korea. Although English is not my first language, I have spent time in the United States as an investment banker at Goldman Sachs & Co. and Morgan Stanley & Co., as well as a one-year exchange student to Stanford University supported by the Fulbright Scholarship Fellow Program. Therefore, I can read and speak the language well enough to prepare this affidavit in English for the benefit of the Court.

2.     I have reviewed the legal papers filed by Eleutian Technology in this lawsuit. Those papers make numerous false and misleading statements regarding the relationship between Eleutian Technology and the Korean investors in the joint venture, as well as the actions taken by the defendants in Korea in response to Eleutian Technology's looting of the joint venture assets, its illegal transfer of assets and intellectual property of the joint venture to a new Korean entity, and the criminal investigation by the Korean prosecutors' office in response to Skylake's complaints regarding the above actions. I submit this affidavit to the Court in the hopes of making an honest record of the events of the past 3+ years and to repair the good name and reputation of Skylake and the rest of the defendants in this lawsuit.

**Background Facts**

3.     Skylake is a private equity firm in Korea specializing in technology-oriented investment opportunities. One of the funds it manages for these investments is Skylake Global Incuvest 1 Private Investments Specialty Co., Ltd. ("Skylake Global"), which is the fund that Skylake used to make an equity investment in a joint venture with Eleutian Technology.

4.     The CEO and President of Skylake is defendant Daeje Chin. Dr. Chin is one of the most respected members of the Korean business and technology community. He was appointed by the President of Korea to be the Minister of the Korean Ministry of Information and Communication (MIC) from 2003 to 2006. During his three-year term, the Korean IT industry flourished, allowing Korea to become the most Internet "wired" country in the world. Prior to becoming the MIC minister, Dr. Chin spent 18 years between 1985 and 2003 at Samsung Electronics, Co., Ltd., including as President and CEO for Digital Media Business between 2000 and 2003. He is regarded as one of the most prominent visionaries and leading experts in

Korea's IT sector, driving Samsung Electronics' rapid growth as one of the strongest global strategic player in the IT sector. Prior to joining Samsung Electronics in 1983, Dr. Chin had worked in IBM's Watson Research Center from 1983 -1985 and Hewlett-Packard from 1981-83. Dr. Chin is currently a chair professor at Korea Information and Communication University. Dr. Chin received his Ph. D from Stanford University (Electrical Engineering), a M.S. in Electrical Engineering from the University of Massachusetts, Amherst and a M.S./B.S. in Electronics Engineering from Seoul National University, our nation's most prestigious academic institution.

## Joint Venture with Eleutian Technology

5.      In April 2008, Skylake made a 1,520,000,000 KRW (approx. $1.6 million) equity investment in a joint venture with Eleutian Technology to market online-based education programs for English as a second language in the Korean market. Another Korean company, CDI Holdings, Inc. ("CDI"), a Korean industry leader in that market, made a 380,000,000 KRW (approx. $400,000) investment in the joint venture. The third investor, Eleutian Technology, invested 100,000 KRW. The percentage interest in the joint venture company, named Eleutian Korea, Ltd. ("Eleutian Korea"), was as follows: Eleutian Technology (50%); Skylake (40%); and CDI (10%). The terms of the joint venture were documented in a Joint Venture Agreement, dated April 8, 2008 (the "JVA"). (A copy of the JVA is attached as **Exhibit A.**)

6.      Eleutian Korea was controlled by a six-person Board of Directors. Three Board members were to be nominated by Eleutian Technology, two were to be nominated by Skylake, and one was to be nominated by CDI. Skylake nominated me and Susan Chin, Dr. Chin's daughter and a Skylake employee; CDI nominated Michael Kim, a CDI executive. I was

appointed Chairman of the Board of Directors of Eleutian Korea and its temporary CFO.  Both

Ms. Chin and Mr. Kim also are named as defendants in this lawsuit.

7.     Under the terms of the JVA, Eleutian Technology has the right to appoint the

CEO and COO of Eleutian Korea.  Kent Holiday, the President and CEO of Eleutian

Technology, was appointed as the interim CEO of Eleutian Korea and also was nominated to its

Board of Directors.  Kent Holiday said that he would shortly find an independent CEO for

Eleutian Korea to replace him in order to avoid conflicts of interest between Eleutian Korea and

Eleutian Technology.  However, he never did so.  We asked Kent Holiday repeatedly at the

Board of Director meetings to find and appoint an independent CEO for Eleutian Korea.  Kent

Holiday intentionally delayed the search/appointment and remained as CEO in order, we now

believe, to continue his manipulation of and influence over Eleutian Korea.

8.     The JVA is governed by the laws of Korea (Section 11.4) and very importantly

contains a mandatory arbitration provision (Section 11.3.2).  The arbitration provision requires

that "all disputes, controversies, or differences which may arise between Eleutian, Skylake or the

Joint Venture out of or in relation to or in connection with this Agreement, or for the breach

thereof, ***shall be finally settled by arbitration*** in accordance with the Rules of Conciliation and

Arbitration of the International Chamber of Commerce. . ." (emphasis added).  The arbitration is

to be "held in Maui, Hawaii, and all proceedings shall be conducted and reported in the English

language."  The arbitration provision specifically allows the arbitrators to award "equitable relief

to the extent the arbitrators deem appropriate."

**Problems at Eleutian Korea**

9.      Almost immediately after the joint venture was funded, Kent Holiday began to

invoice Eleutian Korea for large amounts of expenses under general invoices without any detail

or documentary support.  (Attached as **Exhibit B** are invoices charged to Eleutian Korea by Kent

Holiday on behalf of Eleutian Technology in 2008.)  This situation was brought to the Board's

attention by Mr. Edward Lee, a formal CDI executive who was appointed by Eleutian

Technology in April 2008 as the COO of Eleutian Korea.  When I, together with other Eleutian

Korea executives, questioned Mr. Holiday about these invoices and requested details and

supporting documents, he stalled and made excuses.  When he eventually did supply a

breakdown of the invoices into categories of expenses, it became increasingly clear that

something improper was going on in the company.  For instance, Kent Holiday invoiced

Eleutian Korea more than $820,000 for "Legal Fees and Expenses" in the first seven months of

2009 even though Eleutian Korea was never involved in any lawsuits or corporate transactions

requiring the services of a law firm.  Despite numerous requests to explain these expenses,

neither Kent Holiday nor any other person at Eleutian Technology ever provided support or

details for these or any other category of expenses charged to Eleutian Korea.

10.     The JVA provided that the CEO of Eleutian Korea – Mr. Holiday – "shall at all

times be subject to the direction of the Board of Directors and shall keep the Venturers'

representatives informed as to all matters of concern to the Joint Venture." (Section 3.5).  In

addition, the JVA prohibited Kent Holiday as CEO of Eleutian Korea from taking any action,

expending any funds, or incurring any obligation with respect to any Major Decision (defined in

Section 3.7) without the approval of two-thirds of the shareholders of Eleutian Korea shares.

Among the enumerated Major Decisions was spending funds in excess of the budget, making

any expenditure or incurring any obligation involving a sum in excess of $25,000, or incurring loans or borrowings in excess of $100,000.

11.     It is clear from the invoices in Exhibit B, as well as Eleutian Technology's Memorandum in Support of Motion for Preliminary Injunction, that Mr. Holiday violated his authority as CEO of Eleutian Korea by incurring, as the memorandum claims, "US $6 million for unpaid services provided and loans and credit extended." (*See page 4 of Memo.*)  At a minimum, Mr. Holiday should have stopped incurring expenses from his US company, Eleutian Technology, and billing them to our joint venture company, Eleutian Korea, until he had received specific shareholder approval.  Instead, he invoiced Eleutian Korea a total of $6,529,710.63 in the first 15 months of operation through July 2009, which amount constituted *twice the actual revenue of Eleutian Korea during that time period.*

12.     If the issue regarding the propriety of Eleutian Technology's invoices could not be worked out with the investors when it first arose, the joint venture would have been dissolved in accordance with the terms of the JVA, and Skylake and CDI could have recouped most of their investment.  Instead, Kent Holiday ignored his CEO obligations to the Eleutian Korea investors, and, in blatant disregard of the clear and unequivocal terms of the JVA, continued to transfer money out of the Eleutian Korea bank account to his Eleutian Technology bank account in the United States until the joint venture's bank account was completely depleted of its funds. Kent Holiday did this by circumventing the company's CFO and COO and directing his friend, P. J. Rodgers, who he had made an Executive VP of Eleutian Korea, to transfer funds from the Eleutian Korea bank account directly to an Eleutian Technology bank account.

13.    The Eleutian Korea Board of Directors continued to seek supporting documentation regarding the Eleutian Technology invoices and other information needed by the company's auditors at Samil Price Waterhouse ("Price Waterhouse") to complete an audit of the company as required by the JVA. (Section 4.4(b)).  However, after October 2009, Kent Holiday announced that he would not provide any additional information regarding the invoices.  As a result, Price Waterhouse has never been able to complete an audit of Eleutian Korea.

14.    It was the CEO's duty and responsibility under the JVA to "have operational responsibilities for the accounting, bookkeeping, billing, and general financial affairs of the Joint Venture." (Section 3.8).  Moreover, "[t]he CEO shall strive in all cases to serve the best interests of the Joint Venture, and shall be accessible and responsive to all Venturers." (*Id.*)  Kent Holiday breached these duties to Eleutian Korea and its investors.

15.    Furthermore, Kent Holiday as CEO of Eleutian Korea was required to "[m]aintain full and accurate books and accounts which shall, in reasonable detail, accurately and fairly reflect all transactions of the Joint Venture" and to do so "in accordance with generally accepted U.S. and Republic of Korea accounting principles consistently applied." (Section 4.3).  Indeed, the JVA specifically required that the "CEO shall make available to all members of the Board of Directors on a regular basis, and as reasonably requested, all such information and/or documents as may be required to permit the Board of Directors to make informed judgments with respect to the financial status of the Joint Venture and all other matters of interest to it." (Section 4.4).  Kent Holiday failed to fulfill these obligations as CEO of Eleutian Korea.

## Investors Take Legal Action in Korea

16.     The Korean investors sought the advice of legal counsel in Korea regarding the actions of Kent Holiday and P.J. Rodgers.  Consequently, on November 30, 2009, Skylake filed a criminal complaint with the Korean prosecutor's office against Kent Holiday and P.J. Rodgers for (i) breach of duty, (ii) embezzlement of Eleutian Korea funds, and (iii) violation of Korean foreign exchange laws.  We were advised by Korean counsel that Korean law requires that Skylake as a fiduciary of investor funds file a criminal complaint against all persons known or suspected of committing serious financial fraud or wrongdoing.  Not doing so might expose Skylake to liability to its fund investors for breach of our duties to safeguard their investments.

17.     In response to the criminal complaint, I understand that Kent Holiday met with the Korean prosecutors sometime in February 2010 for a defendant's exam.  After this meeting, Skylake was contacted by the prosecutor's office and told that a second meeting was scheduled for April 28, 2010 at which Skylake would attend and confront Mr. Holiday and cross-examine him.  The prosecutor's office is the one that set the date and meeting, not Skylake.  I am advised by Korean counsel that this is a normal procedure of the prosecutor's office in Korea for investigating criminal matters of this kind.  Kent Holiday promised the Korean prosecutor that he would return to Korea to attend the April 28 meeting but he never showed up.

18.     In the interim, Kent Holiday met with Skylake on March 3, 2010 at the Grand Hyatt Seoul hotel to discuss Eleutian Korea's financial situation.  We reiterated our demand for an accounting of how the investors' $2.0 million in capital plus all revenues had been spent and for greater detail and explanation of the Eleutian Technology invoices.  Kent Holiday made

delaying excuses for the lack of financial information and nothing was able to be resolved at that meeting.

19.     In mid-2010, Skylake discovered that Kent Holiday had moved Eleutian Korea's entire operation, employees, property, website, and clients to a new undisclosed location under a different corporate entity, and was continuing to conduct business with Eleutian Korea's customers, such as IGSE, Global Cyber Technology, and the Education Office of Incheon City. This was a clear breach of the JVA's Non-Competition provision (Section 3.12), as well as many other provisions of that agreement.

20.     In fact, Kent Holiday had terminated the lease for Eleutian Korea's Seoul offices and had taken the lease deposit back from the landlord. To this day we do not know where Kent Holiday moved his Korea business. We learned only recently from the notice of an AAA arbitration demand against Eleutian Korea filed in January 2011 that Kent Holiday had "moved" Eleutian Korea's offices to a "virtual office" address in the Asem Tower in Seoul. We visited this address and it is only a mail drop location for numerous companies. There are no physical offices, files, or employees of Eleutian Korea at that location. (Attached as **Exhibit C** is a copy of the AAA Notice of Arbitration, dated January 6, 2011.)

21.     In consultation with Korean counsel, "cease and desist" letters were prepared and sent to IGSE in August 2010, and to Global Cyber Technology, and the Education Office of Incheon City in December 2010. These letters were standard "cease and desist" letters that attorneys or companies routinely deliver to persons believed to be infringing — knowingly or unknowingly — a company's intellectual property or participating in a breach of a contract. They are intended to stop the offending conduct and to notify the offending party of the potential

civil and criminal liability they face if they do not cease their conduct.  I am informed that similar letters are routinely prepared in the US in similar circumstances.  For Eleutian Technology in this lawsuit to characterize our conduct pursuant to Korean law as "over the top" or "below the belt" or more aggressive than what US lawyers do pursuant to US law in similar situations I find lacking all credibility.

22.     Skylake later heard from the Education Office of Incheon City that Kent Holiday had been in Korea in October 2010.  Skylake contacted the prosecutor's office to find out whether they knew that Kent Holiday had been in Korea.  The prosecutor's office told us that Kent Holiday actually had been in Korea several times since April 2010 and that the prosecutor's office had received reports from Customs of his arrival in the country, but by the time they contacted Kent Holiday's Korean lawyers at Kim & Chang to schedule a cross-examine meeting, he had already left the country.

23.     As a result of Kent Holiday's evasion, Skylake's lawyers filed a legal petition with the Korean prosecutor's office on November 10, 2010, requesting that they complete their investigation and, at a minimum, block Kent Holiday's departure from Korea the next time he enters the country so that a cross-examination meeting could be held.

24.     Also in consultation with Korean counsel, Skylake went back to the Korean prosecutor's office on November 26, 2010 and filed a second criminal complaint against Kent Holiday and a Mr. Sang Kwon Kang, the Eleutian Korea executive formerly in charge of the company's public education business, which accounted for approximately 70-80% of Eleutian Korea's revenue, but who now is head Managing Director of IGSE business.  The second criminal complaint charged the two men with breach of fiduciary duty for removing all tangible

and intangible assets of Eleutian Korea to a third-party company in direct competition with the business of Eleutian Korea.

25.     On February 1, 2011, Susan Chin of Skylake was called by the Korean prosecutors to schedule a cross-examination meeting with Kent Holiday for some time between February 7-9, 2011. She replied that either February 8 or 9 would be possible. The prosecutors then spoke with Kent Holiday's legal counsel at Kim & Chang and the meeting was decided for February 9. The prosecutor's office is the one that set the date and meeting, not Skylake.

**Wyoming Lawsuit**

26.     On January 7, 2011, Eleutian Technology filed this lawsuit in Wyoming, and on January 19, 2011 obtained a TRO against the defendants. This was done without adequate notice to defendants or sufficient time to arrange for representation in the U.S., so no defense could be submitted to the Court before its decision was made.

27.     The Court should be aware that none of the defendants lives or works in Wyoming or, indeed, anywhere in the U.S. The defendants are all Korean companies or Korean residents that have no contacts in the U.S. All commercial transactions entered into by the defendants with U.S. parties always include a mandatory arbitration provision, specifically to avoid having to defend ourselves in a foreign jurisdiction. International commerce would not be possible if counter-parties could force us to defend claims in their various home jurisdictions.

28.     After learning of the complaint filed against us in this Court, Skylake took counsel from its Korean lawyers about how to proceed. Then all the separate defendants had to be organized to agree to a joint representation. Then Korean counsel had to find lawyers in the

U.S. familiar with Korea and capable of handling this type of litigation. The U.S. lawyer we retained, John D. Lovi of Steptoe & Johnson LLP, then had to find and retain local counsel in Casper, Wyoming to appear on defendants' behalf before this Court. All of this took until the day of the preliminary injunction hearing to complete, and then there was only enough time for counsel to request an extension of time to submit legal papers in opposition to this lawsuit and the preliminary injunction motion.

29.     As the Court can certainly appreciate, preparation of our defense is further complicated by the need first to translate the U.S. legal papers into Korean (as not all the defendants or their counsel are fluent in English). Then many Korean documents needed to be translated into English for the benefit of our U.S. lawyers. This takes a lot of time, as well as the time it takes to brief U.S. counsel on the laws, practices and customs in Korea regarding business laws and legal proceedings. Also, there is a 14-hour time difference between New York and Seoul, further complicating legal preparations.

30.     Eleutian Technology claims to have served legal papers on Skylake's office in the U.S. located in San Jose, CA. Skylake does not have an official office in San Jose, CA. The "office" that Plaintiff refers to is the address of a consultant, Mr. Don Soo Suh, who is not a Skylake employee, but rather an independent contractor whose company, Skylake Advisors U.S.A., is a sole proprietorship acting pursuant to an annually-renewed Consulting Agreement with Skylake. The Consulting Agreement specifically states that the "Consultant will not be acting as the employee, agent, partner, servant or representative of the Company, and the Consultant will not have any authority to bind the Company or any subsidiary of the Company in any manner." (A copy of the latest Consulting Agreement, dated as of January 1, 2011, is

attached as **Exhibit D**.) Although our company's website refers to a San Jose office, that is for marketing purposes only.

31.     After Skylake received a copy of the TRO it did not contact any companies regarding the Eleutian Technology matter. We complied completely with the terms of that TRO consistent with our obligations under Korean law, even though we maintain (i) that this Court has no personal jurisdiction over the defendants, (ii) that the Court should not hear the matter because this dispute must be arbitrated, and (iii) because the facts do not warrant any injunctive relief.

**Harm to Defendants Caused by Wyoming Lawsuit and Injunction**

32.     The Wyoming lawsuit and the Court's TRO have caused severe hardship and damage to the defendants' finances, reputations, and goodwill in Korea. The Wyoming lawsuit, which seeks $40 million in damages, was leaked to the Korean newspapers. CDI was contacted on January 19, 2011 by a Ms. Hee-Na Oh, a reporter for *E-Today* in Korea, who said she was going to break the story in the Korean press. Upon this information, defendant CDI had no choice but to make a public announcement required by Korean law because CDI is a public company listed on the Korean stock exchange. Therefore, CDI made such public announcement on January 21, 2011.

33.     Upon this announcement, and several news articles that followed it, CDI's stock price dropped 12% from 13,950 KRW to 12,500 KRW, a loss of approximately $9.0 million in equity. In addition, CDI, a leading educational institute in Korea, and Skylake, a private equity firm headed by a prominent former Korean Cabinet Minister, have suffered severe damage to their reputations and goodwill with our customers and investors.

- 13 -

34.     The defendants' sole interest in this matter is to recover the monies lost from their investments in the Eleutian Korea joint venture.  Skylake was advised by counsel to file criminal claims in Korea pursuant to Korean law.  We are entitled nonetheless to proceed with our civil claims in arbitration pursuant to the contracts signed by Eleutian Technology and to protect our interests against further harm through "cease and desist" letters.  The criminal and civil actions in Korea are entirely separate and distinct.  I understand that U.S. law is not different.  If a U.S. company's Board of Directors or investors suspected fraud and embezzlement by its management, the company and investors can notify the U.S. Attorney's Office and also file civil complaints for damages against its management.  Korea is no different.

35.     We have an obligation to cooperate with the Korea prosecutor's ongoing investigation of our criminal complaint and to simultaneously proceed with our civil remedies to recover the lost monies for our investors and shareholders.  Plaintiff attempts to portray our actions as something underhanded and manipulative, and to suggest to this Court that Koreans and Korean legal procedures are disreputable and corrupt.  This is a cultural slur based on ignorance that is deeply offensive to me and all Korean people.  I can admit to this Court that there is also great apprehension on the part of the Korean defendants to being sued by a Wyoming company in a Wyoming court which is being asked to issue restraining orders and contempt charges against us for what is perfectly legal and proper under Korean law.  We believe that Kent Holiday and Eleutian Technology are the ones using this Court to improperly pressure us to drop our claims against them in Korea.

36.     It is our intention at this point to work within the framework of both the Korean and U.S. legal systems to arrive at a fair and just outcome.  However, Plaintiff is asking this Court to issue extraterritorial orders against Korean companies and Korean citizens who will be

put in the position of having to choose between the conflicting orders of competing sovereigns. This is exactly what we contracted to avoid through a mandatory arbitration provision in our agreements with the Plaintiff. This lawsuit and a preliminary injunction, I understand, would fly in the face of international law, the United States Constitution regarding personal jurisdiction, U.S. Supreme Court precedent regarding the strong judicial policy favoring arbitrations, judicial comity, and norms of basic fairness. We hope and trust that this Court will consider our facts and legal arguments and deny Plaintiff's request for a preliminary injunction and grant our motion to compel the Plaintiff to arbitrate its claims.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Seoul, Korea
       February 8, 2011

Seungwoo Kevin Choi

NY Doc # 28359

- 15 -

# EXHIBIT A

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT is entered into on this 8th day of April, 2008, by and between Eleutian Technology, L.L.C., a limited liability company organized under the laws of the State of Wyoming, U.S.A. ("Eleutian"), Skylake Global Incuvest 1 Private Investment Specialty Co., Ltd., a corporation organized under the laws of Republic of Korea ("Skylake"), and CDI Holdings, Inc., a corporation organized under the laws of the Republic of Korea ("CDI").   Eleutian, CDI, and Skylake may from time to time be referred to as "Venturers".

## RECITALS

A.      Eleutian has designed and developed English teaching programs whereby English language learners receiving the service can, through means of information technology, study English, speak and/or interact directly with native English teachers located in the United States who are trained in the Eleutian program.

B.      CDI is a Korean industry leader in the English as a Foreign Language (EFL) market and English as a Second Language (ESL) market.

C.      Skylake, CDI and Eleutian desire to establish a joint venture in order to develop new content for the EFL/ESL market and expand Eleutian's services in the Republic of Korea (hereinafter "Korea").

D.      This Agreement is designed to create that joint venture and to provide for its formation, ownership, and operation.

## TERMS

1.      **Formation, Purposes, and Duration**

    1.1      **Formation and Name**

        1.1.1   **Formation**

The Venturers hereby agree to form a joint venture (the "Joint Venture") in such business form as will meet their mutual tax and operational purposes.   It is anticipated that the Joint Venture will be organized in the form of a Korean joint stock corporation (hereinafter "Corporation" reffered to under Korean laws as *Chushik Hoesa*"), but the form thereof shall be decided upon in consultation with Korean counsel.   Eleutian shall be responsible for establishing the Corporation.

### 1.1.2  Name

The name of the Corporation shall be "Eleutian Korea, Ltd."

## 1.2  Effective Date

The Effective Date, for purposes of this Agreement, shall be the date that the Corporation is formed as set forth herein, and Venturers have obtained all Korean government approvals necessary for operation of the Joint Venture in the Republic of Korea.

## 1.3  Purposes and Scope of the Joint Venture

### 1.3.1  Business Purposes

The Joint Venture is formed solely for the purposes of selling Eleutian's English language training programs and services within Korea, and for conducting all other acts necessary or incidental thereto ("Business Purpose").

### 1.3.2  General Authority

In order to carry out the Business Purpose of the Joint Venture set forth in Section 1.3.1, the Joint Venture may acquire, own, lease and operate property, enter into contracts, hire personnel, and undertake and do all other lawful acts necessary for or incidental to the Business Purpose.

### 1.3.3.  Initial Public Offering

The Joint Venture shall be operated by the Venturers with the mutual understanding that the Joint Venture shall accumulate its own independent and subtainable company value enough to be listed in the Korea Stock Exchange within four [4] years from its incorporation.

## 1.4  Scope of Venturer's Authority

Except as otherwise expressly and specifically provided for in this Agreement, none of the Venturers shall have any authority to bind or act for, or assume any obligation or responsibility on behalf of, the other Venturers or the Joint Venture. This Agreement shall not be deemed to create a partnership between the Venturers with respect to any activities other than the activities within the scope of the Business Purpose of the Joint Venture.

### 1.5   Principal Place of Business

The initial principal place of business of the Joint Venture shall be located in Seoul, Republic of Korea, at a location to be decided by the Venturers.

### 1.6   Term

The term of the Joint Venture shall commence as of the Effective Date, and shall continue indefinitely, unless sooner terminated in accordance with the provisions of Section 9 of this Agreement.   Except in the event that this Joint Venture is terminated by Default as set forth herein, or by mutual agreement of the Venturers, no Venturer shall, in a single transaction or a series of transactions, sell or otherwise transfer in excess of 10% of its initial shares in the Corporation until the passage of three (3) years, or upon IPO of the Joint Venture, whichever first occurs.   Not Whithstanding the above, within 120 days of the Effective Date, Eleutian shall have the right to sell, transfer, pledge, or contract to sell or transfer up to 27% of the shares it holds in the Joint Venture to Joint Venture executives, employees, and Seoul Digital Univeristy Foundation.   Such transaction shall not be deemed part of the 10% transfer limit found in the paragraph 1.6.

### 1.7   Intellectual Property Rights.

It is the Venturers intent to create new content, software, delivery systems, and products for the EFL and ESL market ("Created IPR").

1.7.1   To the extent that the Created IPR was created solely by employees and consultants of the Joint Venture, the Created IPR shall be owned in whole by the Joint Venture.

1.7.2   To the extent the Created IPR was created solely by one of the Venturers, such Created IPR shall be owned in whole by that Venturer.

1.7.3   To the extent the Created IPR is created in joint collaboration among Venturers and/or the Joint Venture, without a joint development agreement, such Created IPR shall be owned jointly by each collaborating party and each collaborating party shall be deemed to have a worldwide royalty free license to such Created IPR.

## 2.   Ownership; Duties of the Venturers

### 2.1   Ownership of the Joint Venture Interest; Duties of the Venturers

The Venturers shall have the following undivided percentage interest in the Joint Venture:

| Eleutian | Skylake | CDI |
|----------|---------|-----|
| 50% | 40% | 10% |

The CEO appointed pursuant to this Agreement shall have the option to receive up to a total of 5% of the stock of the Corporation over a period of three (3) years, pursuant to approval of the Board of Directorsand General Shareholders Meeting. In such case, each Venturer's ownership interest shall be diluted pro-rata upon such CEO's acquisition of stock.

   **2.1.1**   Eleutian shall also have the absolute right (but shall not be required) to solely purchase, from the Joint Venture, new shares to be issued representing 25% post issuance of the issued shares of the Joint Venture for a purchase price of Two Billion Korean Won (2,000,000,000 KRW) on or before September 1, 2008. Eleutian may assign this right to other Venturers at its sole discretion in whole or in part.

### 2.2   Duties of Eleutian

Immediately after the execution of this Agreement, Eleutian shall do the following:

#### 2.2.1   Capital

Eleutian will contribute cash in the amount of One Hundred Million Korean Won (100,000,000 KRW) no later than March 25, 2008.

#### 2.2.2   Services

Eleutian will provide the Joint Venture with a first right to purchase the products of Eleutian pursuant to the terms and conditions of Distribution Agreement in form attached hereto as Exhibit A (the "Distribution Agreement").

### 2.2.3  Employees

Eleutian will provide, on a rotational basis as needed, one or more employees from the United States as necessary to acquaint the Joint Venture with Eleutian's services or to provide necessary support.   Such employees shall either be employees of the Joint Venture itself, or their compensation and expenses reimbursed by the Joint Venture.

### 2.3     Duties of Skylake

Immediately after the execution of this Agreement, Skylake shall do the following:

### 2.3.1  Capital

Skylake will contribute cash in the amount of One Billion Five Hundred Twenty Million Korean Won (1,520,000,000 KRW) no later than ten (10) business days after the execution of this Agreement.

### 2.3.2  Sales Organization

Skylake shall assist Joint Venture in creating a sales organization to market Eleutian's services in Korea, and Skylake shall otherwise provide its general knowledge of the market in the Republic of Korea.

### 2.3.3  Employees

Skylake shall be entitled to, and shall make best efforts to, appoint two (2) employees who shall work full time for the Joint Venture and shall be employees of the Joint Venture, one of which shall be the initial Chief Financial Officer of the Joint Venture.

### 2.4     Duties of CDI

Immediately after the execution of this Agreement, CDI shall do the following:

### 2.4.1  Captial

CDI will contribute cash in the amount of Three Hundred Eighty Million Korean Won (380,000,000 KRW) not later ten (10) business days after the execution of this Agreement.

### 2.4.2   Sales Organization

CDI shall assist the Joint Venture in creating a sales organization to market Eleutian's services in Korea, and CDI shall otherwise provide its general knowledge of the market in the Republic of Korea. CDI shall also offer counsel regarding potential business opportunities in other market segments in the form of one or more of the following, but not limited to: market analysis, business modeling, business feasibility analysis, business marketability analysis, business profitability analysis.

### 2.4.3   Employees

CDI shall designate a program/product manager who shall become an employee of the Joint Venture and whose job shall be overall coordination and management of new content developed for the Joint Venture.

### 2.4.4   First Right to License/Purchase

CDI will provide the Joint Venture with a first right to license/purchase 1)CDI program/content in conjunction with video conferencing teaching ; and/or 2) CDI consultation/customization services; for the purpose of reselling educational services in learning centers known as "bosup hakwon (보습 학원)," Korean public schools, Korean after school programs operated in cooperation with public schools, and professional development programs for Korean public school teachers.   CDI shall license/sell such content/services to the Joint Venture at a price that is equal to or less than the lowest pricing sold by CDI within last twelve (12) months.   It is the intention of the Venturers that the Joint Venture will license certain content from CDI for the market segments mentioned in this paragraph 2.4.4 for the forseeable future. In the event the Joint Venture and CDI cannot agree on a comprehensive licensing agreement prior to August 1, 2008, CDI shall have the right, but not the obligation, to return to the Corporation all shares issued to CDI in exchange for the original purchase price of the shares ("Put Option"). CDI must give notice of its intent to exercise such Put Option after August 1, 2008 and prior to August 15, 2008.   The Joint Venture shall repurchase the Put Option shares within fifteen (15) days of CDI giving notice of its intent to exercise option.

### 2.4.5   CDI Advisor

CDI shall provide, from time to time, the President of CDI AMERICA to assist Eleutian or the Joint Venture with business operations, training operations, business modeling and analysis, quality control, and other business advice.   Eleutian shall pay CDIA a compensation of $1,000 USD/Month.   Eleutian will provide CDIA President with monthly reports commensurate with the assistance he is offering. In the event

that CDI Advisor incurs travel expenses at the request of Eleutian or the Joint Venture, such expenses shall be borne by requesting party.

## 3.   Management

### 3.1   Board of Directors

The Corporation shall be managed by a Board of Directors to be comprised of six (6) individuals, three (3) to be nominated by Eleutian, and two (2) to be nominated by Skylake and one (1) to be nominated by CDI.   Skylake shall have the right to appoint the Chairman of the Board from among its Directors.   None of the Venturers may remove any director nominated by the other Venturers.   Any Venturer shall have the complete right, in its sole discretion, to remove or replace its members on the Board upon notice to the other Venturers.   In the event that any Venturer's shareholdings in the Joint Venture are not equal to or exceed 7% of the total issued and outstanding shares of the company, such Venturer shall lose it's rights to appoint any board members and such vacant board seat(s) shall be filled by a vote of the shareholders.

### 3.2   Election of Directors

The directors of the Corporation shall be elected at the Shareholders Meeting. Each Venturer hereby agrees to vote its shares for the candidates so nominated by the other Venturers, so long as the nominating Venturer holds 7% or more of the outstanding shares of the Joint Venture.   The Venturers agree that if any director dies, resigns or leaves office before the expiration of his term, such vacancy shall be filled promptly by the nominating Venturer.

### 3.3   Board of Directors' Meetings

Notice of Board of Directors' meetings shall be given in the English language to each director at least twenty (20) days before the scheduled date of such meeting unless such notice is waived in writing by all of the directors or a different notice provision if required under Korean law.   Directors' meetings shall be held at least annually.   The meetings may be held in person, or by telephone or video conference.

### 3.4   Resolutions of Board of Directors Meetings

The quorum for meetings of the Board of Directors shall be a majority of the total number of directors in office.   The approval of at least 5 directors shall be required for any Major Decisions as set forth in Section 3.7 below.

### 3.5    Day-to-Day Management

The Joint Venture shall have a CEO.   Eleutian shall have the right to appoint the CEO and may remove and replace the CEO at any time in its sole discretion by notice to Skylake.   The CEO may simultaneously serve as one of Eleutian's members on the Board of Directors.   The CEO shall be responsible for implementation of the decisions of the Board of Directors and for conducting the ordinary and usual business and affairs of the Joint Venture as more fully set forth in Section 3.8 hereof.   The CEO shall at all times conform to policies and programs established by the Board of Directors.   The scope of the CEO's authority shall be limited to said policies and programs.   The acts of the CEO shall bind the Venturers and the Joint Venture when within the scope of that CEO's authority.   The CEO shall at all times be subject to the direction of the Board of Directors and shall keep the Venturers representatives informed as to all matters of concern to the Joint Venture.

### 3.6    Chief Operating Officer

Eleutian shall have the right to appoint the Chief Operating Officer (COO) and may remove the COO at any time.

### 3.7    Major Decisions

No acts shall be taken, sum expended, decision made or obligation incurred by the Joint Venture or the CEO with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"),   unless and until the same has been approved by shareholders holding at least two-thirds of the shares of the Corporation.   The Major Decisions shall include the following:

(a)    Bidding on or entering into any contract involving expenditures in excess of 100,000,000 KRW or that involves a term longer than one (1) year;

(b)    Acquiring any equipment or other assets or selling or otherwise disposing of the same whose cost or fair market value is in excess of 100,000,000 KRW;

(c)    Entering into a lease or acquisition of real property or an interest therein in excess of 100,000,000 KRW;

(d)    Approving or modifying the Budget or the Business Plan, or spending funds in excess of the Budget;

(e)    Pledging or otherwise mortgaging or disposing of any of the substantial assets of the Joint Venture;

(f)    The adoption of any logos, trade names, and trademarks for use by the Joint Venture;

(g)    Selecting or varying depreciation and accounting methods and making other decisions with respect to treatment of various transactions for Korean tax purposes or other financial purposes not otherwise specifically provided for herein, provided that such methods and decisions shall be consistent with other provisions of this Agreement;

(h)    Determining whether or not dividends should be made to the Venturers;

(i)    Retention of counsel for the Joint Venture or institution of any legal action;

(j)    Making any other expenditure or incurring any obligation by or on behalf of the Joint Venture involving a sum in excess of 25,000,000 KRW;

(k)    Capital increase or issuance of equity-linked bonds;

(l)    Incurring loans or borrowings in excess of 100,000,000 KRW; or

(m)    Granting any right to any person or entity to acquire any interest in the Joint Venture.

### 3.8    Duties of CEO

The CEO, at the expense of and on behalf of the Joint Venture, shall implement or cause to be implemented all decisions approved by the Board of Directors and delegated to the CEO in writing by the Board of Directors, and shall conduct or cause to be conducted the ordinary and usual business and affairs of the Joint Venture in accordance with and as limited by this Agreement.    As part of his general responsibility for the general business and affairs of the Joint Venture, the CEO shall have operational responsibilities for the accounting, bookkeeping, billing, and general financial affairs of the Joint Venture.    The CEO shall strive in all cases to serve the best interests of the Joint Venture, and shall be accessible and responsive to all Venturers.    Until a CEO is appointed, Mr. Holiday shall be interim CEO and Joint Venutre shall reimburse all travel and business expenses incurred by him related to the Joint Venture.

### 3.9    Business Plan; Budgets

In conjunction with the Board of Directors, the CEO shall, in close cooperation and consultation with the CFO and COO, cause to be prepared a business plan for the Joint Venture which sets forth the anticipated plan for the business of the Joint Venture, together with financial projections therefor (the "Business Plan").   In order to accomplish the Business Plan, the CEO shall, not less often than one time each fiscal year, prepare and submit to the Board of Directors for their consideration and approval a budget ("Budget") setting forth the estimated receipts and expenditures (capital, operating and other) of the Joint Venture for the following fiscal year.   Such Budget shall be submitted to the Board of Directors at least one month prior to the end of the current fiscal year.   When approved by the Board of Directors, the CEO shall implement the Budget and the Business Plan and shall be authorized, without the need for further approval by the Board of Directors, to make expenditures and incur the obligations provided for in the Budget.   The Board of Directors may review and adjust the Budget on a quarterly basis as needed.

### 3.10    Compensation and Reimbursement of Venturers

Full time employees of the Joint Venture shall be compensated by the Joint Venture.   Each of the Venturers agrees that they shall not be entitled to reimbursement from the Joint Venture or from the other Venturers for any expenditure incurred by that Venturer in connection with this Agreement or the Joint Venture prior to the execution of this Agreement. However, following the establishment of the Joint Venture, Eleutian shall be reimbursed from Joint Venture for expenses relating to the office lease deposit.

### 3.11    Contracts with Related Parties; Avoidance of Conflict

Neither the CEO nor any other officer of the Corporation shall knowingly enter into any agreement or other arrangement for the furnishing to or by the Joint Venture of goods or services with any individual or entity related to or affiliated with the CEO, any officer of director of the Corporation, or any Venturer unless such agreement or arrangement has been approved by the Board of Directors after the nature of the relationship or affiliation has been disclosed.

### 3.12    Non Competition

During the term of this Agreement, the Venturers shall not directly or indirectly own an interest in any business or ventures which offers an educational Distance Learning Solution (as defined below) to the Korean market.   Nothing in this Section 3.12 (with the exception of 3.12a) shall be deemed to restrict any Venturer from

owning an interest in any business or entity who sells products outside of the Republic of Korea, so long as that business or entity does not sell a Distance Learning Solution within the Republic of Korea.   As a sole remedy of a breach of this Section 3.12 and 3.12(a), a Venturer in breach of this Section 3.12 shall inform the other Venturers of the breach and shall offer to sell all of its shares of the Joint Venture to the other Venturers (pro-rata) at a price equal to the original purchase price of the shares. The non-breaching Venturers shall have 120 days to accept or reject such offer.   Distance Learning Solution shall be defined as a service and/or product in which students are taught via video-conferencing, online streaming, or similar technology which enables the student to view out of room teachers in real time.

### 3.12(a) CDI Restriction

CDI shall not partner with, sell to, buy from, license to/from, affiliate with, or in any way enter into a business relationship with any entity (with the exception of the Joint Venture) who offers or is developing a Distance Learning Solution.   CDI shall also not create their own Distance Learning Solution.

### 3.13   Scope of Authority; Indemnification

Neither of the Venturers shall, without the consent of the other Venturers, take any action on behalf of or in the name of the Joint Venture, or enter into any commitment or obligation binding upon the Joint Venture, except for (a) actions expressly provided for in this Agreement, (b) actions by the CEO within the scope of his authority granted hereunder, and (c) actions authorized by the Board of Directors in the manner set forth herein.   Each Venturer shall indemnify and hold harmless the other Venturers and their affiliates, directors, and officers against any and all claims, demands, losses, damages, liabilities, lawsuits and other proceedings, judgments and awards, and costs and expenses (including but not limited to   attorneys' fees), arising directly or indirectly, in whole or in part, of any breach of the foregoing provisions by such Venturer or its affiliates, officers, agents or employees.

### 3.14   Public Announcements

No public announcement or press release with respect to the activities or affairs of the Joint Venture shall be made by the Venturers without the approval of the Board of Directors, or as required by law.

4.      **Accounting and Other Record Keeping**

### 4.1    Fiscal Year

The fiscal year of the Joint Venture shall conclude on December 31, 2008.

### 4.2    Accountants to the Joint Venture

The independent certified public accounting firm of Samil Price Waterhouse shall act as the independent certified public accountants to the Joint Venture unless otherwise agreed by the Board of Directors.

### 4.3    Accounting and Internal Controls

The Venturers shall conduct the Business of the Joint Venture at all times in accordance with high standards of business ethics.   The Joint Venture shall maintain separate books and accounts in accordance with generally accepted U.S. and Republic of Korea accounting principles consistently applied, and specifically, shall:

(a)     Maintain full and accurate books and accounts which shall, in reasonable detail, accurately and fairly reflect all transactions of the Joint Venture; and

(b)     Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that all (i) transactions are executed in accordance with general or specific authorizations and (ii) transactions are recorded as necessary to permit preparation of all tax returns and financial statements in conformity with generally accepted accounting principles, to ensure compliance with all relevant governmental regulations regarding such matters and to maintain accountability for assets.

### 4.4    Financial and Business Information and Tax Returns

The CEO shall:

(a)     Make available to all members of the Board of Directors on a regular basis, and as reasonably requested, all such information and/or documents as may be required to permit the Board of Directors to make informed judgments with respect to the financial status of the Joint Venture and all other matters of interest to it;

(b)     Within ninety (90) days after the end of each fiscal year, provide the Board of Directors with regular annual audited financial statements prepared by the Joint Venture's certified independent public accountants that shall include a statement of profit and losses, changes in financial position and a balance sheet for the year then

ended, and include such other appropriate financial information reasonably requested by the Venturers;

(c)     Cause to be prepared and delivered to the Venturers within thirty (30) days after the end of each calendar quarter, unaudited interim financial statements reflecting profit and loss, changes in financial position and a balance sheet for such interim period: and

(d)     Cause to be prepared and filed before delinquency all necessary tax returns and all other informational and financial reports and records required by any governmental entity.

### 4.5     Bank Accounts

All funds of the Joint Venture shall be deposited in the Joint Venture's separate name in separate bank account at CitiBank and shall be withdrawn only upon the signature of persons authorized by the Board of Directors or in accordance with the procedures set forth in the Business Plan.

### 4.6     Location and Rights of Inspection

The Joint Venture's books and records of account shall be kept and maintained at all times at the principal place of business of the Joint Venture as designated by the Venturers pursuant to Section 1.5 of this Agreement.   Each Venturer and its authorized representative shall have the right to inspect, examine and copy the books, records, files, and other documents of the Joint Venture at all reasonable times.

## 5.     Confidentiality

### 5.1     General Obligations of Confidentiality

During the course of the Joint Venture's operations and prior to the commencement thereof, each Venturer may have occasion to receive from and have access to confidential proprietary information provided by the other Venturers.   Each Venturer (the "Receiving Venturer") agrees to keep confidential all such information ("Confidential Information") received directly or indirectly from the other Venturers or from its Affiliates (the "Disclosing Venturer") pursuant to or in connection with this Agreement or received from or developed by the Joint Venture.   All information provided by one Venturer to the other shall be deemed to be Confidential Information whether or not marked as such by the disclosing Venturer.   Furthermore, each Receiving Venturer agrees not to:

(a)    Disclose to any third party Confidential Information of the Disclosing Venturer or of the Joint Venture; and

(b)    Make any commercial use of such Confidential Information of a Disclosing Venturer or of the Joint Venture except as is contemplated by the operations of the Joint Venture and except as is otherwise allowed by the agreements contemplated by this Agreement

## 5.2    Certain Limited Disclosures

Notwithstanding the provisions of Section 5.1 however, nothing in this Agreement shall be deemed to prevent any Venturer from making such limited disclosures of Confidential Information of the Disclosing Venturer or of the Joint Venture to its Affiliates, agents, governmental authorities, subcontractors, suppliers and purchasers as is reasonably necessary to carry out the purposes of the Joint Venture, or as required by law.

## 5.3    Restrictions

Each Receiving Venturer agrees that:

(a)    It will make no more copies of Confidential Information of the Disclosing Venturer or of the Joint Venture other than as is reasonably necessary on a need to know basis for the Receiving Venturer's internal use or for use by the third Venturers to which disclosure is permitted pursuant to Section 5.2 but only for such uses as contemplated by Section 5.2;

(b)    It may, if it chooses, cause all such copies to be marked confidential;

(c)    It shall instruct its officers, employees, and contractors/agents  to whom such confidential information may be disclosed pursuant to Section 5.2 to keep such copies confidential; and

(d)     Upon any dissolution and winding up of the Joint Venture, it shall return all such copies in its possession (as well as originals) to the Disclosing Venturer or to the Joint Venture, as the case may be, and shall cause all third Venturers (other than governmental authorities) to return to the Disclosing Venturer or to the Joint Venture, as the case may be, all copies of Confidential Information of that Venturer or of the Joint Venture.

### 5.4     Definition of Confidential Information

For purposes of this Section 5, Confidential Information of a Disclosing Venturer and of the Joint Venture shall include all technical, pricing, commercial, or other information or data of such Disclosing Venturer (including of Affiliates of such Venturer) or of the Joint Venture, as the case may be, except for such technical or other information or data which:

(a)     At the time of disclosure is in the public domain or which subsequently becomes part of the public domain (except by wrongful act of the Receiving Venturer); or

(b)     Was in the possession of the Receiving Venturer prior to its receipt thereof; or

(c)     Was received by the Receiving Venturer from a third party having no obligation of secrecy with respect thereto.

### 5.5     Survival of Obligations

The provisions of this Section 5 shall become effective as of the execution of this Agreement and shall survive any dissolution or winding-up of the Joint Venture and any termination or expiration of this Agreement and shall remain applicable to a Venturer notwithstanding its withdrawal from the Joint Venture.   In addition, each Venturer shall continue to be bound by the obligations of this Article with respect to any Confidential Information.

### 6.     Sale, Transfer, or Mortgage of Interest in Joint Venture

This Section 6 shall be valid for a period of three (3) years or until the Joint Venture is publicly listed, whichever occurs first.

### 6.1   Restrictions on Sale, Transfer or Mortgage of Joint Venture Interest

Except as provided in this Section 6 and except as may be otherwise agreed to by the Venturers, no Venturer shall sell, assign, transfer, mortgage, charge or otherwise encumber any part or all of its Joint Venture interest without the prior approval of the other Venturers.   Any attempt to transfer without the prior approval of the other Venturers shall be void.   Shares sold under Section 1.6, which allows Venturers to sell 10% of their initial shares, shall not be subject to this Section 6; provided, however, that disposition of 10% of the initial shares shall, notwithstanding any provision herein to the contrary, require an advance approval by the other Venturers.

### 6.2   Right of First Refusal

If any Venturer elects to sell, transfer or otherwise dispose of any or all of its interest in the Joint Venture in accordance with Section 1.6, with the exception of the the 27% allowed the be transferred by Eleutian, it shall first offer to sell or transfer the interest to the other Venturers and shall set forth in detail the price, terms and conditions thereof.   If the other Venturers are unable or unwilling to purchase the shares on the terms offered within thirty (30) days of the date of the offer, the Venturer may sell its interest in the Joint Venture to a third party at a price and terms no more favorable than offered to the other Venturers, subject to the tag along provisions set forth in Section 6.3.      Such sale must close within one hundred twenty (120) days after the date the other Venturers elected not to purchase such shares and if not, the right of first refusal under this Section 6.2 shall again be applicable before any sale can occur.

### 6.3   Tag Along Provisions

a)      With the exception of each Venturers rights in Section 1.6 to sell or otherwise transfer 10% of it's holding in the Joint Venture, each Venturer hereby agrees that such Venturer shall not sell or otherwise dispose of any shares of the Corporation to any third party unless the terms and conditions of such sale or other disposition shall include an offer by such third party to the other Venturers (the "Included Offeree") to purchase, at the option of the Included Offeree, such number of of shares beneficially owned by such Included Offeree as determined in accordance with this Section 6.3.   If a Venturer receives a bona fide offer to purchase or otherwise acquire (an "Included Offer") any shares of the Corporation held by it which it desires to accept (the "Included Shares") from a third party, such Venturer shall then cause the Included Offer to be reduced to writing and shall provide written

notice (the "Included Notice") of such Included Offer to the Included Offeree in the manner set forth in this Section 6.3.   The Included Notice shall contain an offer by such third party to purchase or otherwise acquire, in addition to the Included Shares being acquired from such Venturer, shares of the Included Offeree at the same price and on the same terms as contained in the Included Offer and shall be accompanied by a true and correct copy of the Included Offer (which shall identify the third party, the number of shares which the third party is seeking to purchase or otherwise acquire, the price contained in the Included Offer and all the other terms and conditions of the Included Offer). The Included Offeree shall, within thirty (30) days after the date the Included Notice is given to such Included Offeree (the "Included Notice Period"), deliver a written notice to the Venturer that was the initial recipient of the Included Offer (the "Tag-Along Notice"), which notice shall specify the number of shares of the Corporation held by such Included Offeree which it wishes to sell pursuant to the Included Offer (the "Tag-Along Shares") and the total number of shares then beneficially owned by such Included Offeree.   In the event such third party shall modify the Included Offer in any way, the third party shall send an amended Included Notice to the Included Offeree.   The Included Offeree shall, if it so desires to sell, transfer or otherwise dispose of Tag-Along Shares pursuant to the Included Notice, as so amended, prior to the later of five (5) days after the date such amended Included Notice is received by the Included Offeree or the end of the original Included Notice Period, deliver an amended Tag-Along Notice specifying the amended number of Tag-Along Shares.

(b)   The Included Offeree shall have the right to sell pursuant to the Included Offer a number of Tag-Along Shares equal to the product of (x) the total number of shares then beneficially owned by such Included Offeree multiplied by (y) a fraction, the numerator of which shall be the total number of shares proposed to be purchased by the third party and the denominator of which shall be the sum of all shares of the Corporation beneficially owned by the Selling Venturer and the Included Offeree.   For purposes of this Section 6.3, the Venturer and the Included Offeree shall be hereinafter referred to as "Sellers".   If any Seller has not indicated a desire to sell all of the Included Shares or Tag-Along Shares, as the case may be, permitted to be sold by it pursuant to this Section 6.3, then the Seller who has indicated a desire to sell more than the Included Shares or Tag-Along Shares, as the case may be, permitted to be sold by such Seller pursuant to the first sentence of this paragraph shall have allocated to such Seller the right to sell an additional number of Included Shares or Tag-Along Shares, as the case may be, owned by such Seller until the entire number of shares available to be sold to the third party shall have been allocated among the Sellers.

(c)  If at the termination of the Notice Period the Included Offeree shall not have accepted the offer contained in the Included Notice, such Included Offeree shall be deemed to have waived any and all of its rights under this Section 6.3 with respect to the sale or other disposition of its Tag-Along Shares to such third party; provided that such sale or disposition is completed on the terms set forth in the Included Notice within sixty (60) days after the termination of the Notice Period.

(d)  Notwithstanding anything contained in this Section 6.3, there shall be no liability on the part of any Seller to any other Seller in the event that the sale of shares pursuant to this Section 6.3 is not consummated for whatever reason, unless such sale is not consummated due to the willful misconduct of such party. Whether a sale of shares is effected pursuant to this Section 6.3 by a Seller is in the sole and absolute discretion of such Seller.

(e)  In the event that the third party does not purchase the Included Shares and Tag-Along Shares, if any, from the Sellers required to be purchased by the third party in accordance with this Section 6.3, or the relevant Seller fails to comply with its obligations under this Section 6.3, then any transfer by the relevant Seller to such third party shall be null and void and of no effect whatsoever.

(f)  Any shares acquired by the CEO shall be subject to these Sections 6.2 and 6.3 in the same way as applicable to the Venturers.

### 6.4    Survival and Waiver

Failure of a Venturer to exercise its rights under Sections 6.1, 6.2 or 6.3 shall not constitute a waiver thereof, and a single exercise of such right shall not preclude any other or further exercise thereof.   The express waiver by a Venturer of its rights under this Section 6 in a particular instance or circumstance shall not constitute a waiver thereof in any other instance or circumstance.   The rights set forth in this Section 6 shall survive the termination of this Agreement and the dissolution of the Joint Venture.

### 6.5    Drag Along

Regardless of any other provisions of this Agreement, at any time if Venturers owning stock which represents more than 70% of the issued and outstanding shares of the Joint Venture desire to sell their shares of the Joint Venture, in their entirety, such selling shareholders shall send notice to other Venturer(s) and may require those Venturer(s) to also sell their shares, in their entirety, of the Joint Venture to the buyers(s) on the same terms and conditions.

7.    **Default**

7.1    **Event of Default**

For purposes of this Agreement, the occurrence of either of the following is to be considered an event of default ("Event of Default"):

(a)    The failure by any Venturer to pay all or any portion of its capital requirements, which failure to pay remains uncured for a period of thirty (30) days after notice of nonpayment by the other Venturers, or

(b)    Any breach by a Venturer of any other material duty imposed upon it under this Agreement if (i) such breach has not been cured or (ii) the defaulting Venturer has not commenced appropriate action to cure such breach within thirty (30) days following the giving of notice of such breach by the other Venturers and continues with all diligence to complete such cure; or

(c)    The institution (a) against Eleutian of a proceeding under any section of the Federal Bankruptcy Code, or against (b) against Skylake under any provision of the bankruptcy laws of Korea, as now existing or hereafter amended which proceeding is not dismissed, stayed or discharged within a period of sixty (60) days after filing thereof, or if stayed, which stay is thereafter lifted without a contemporaneous discharge or dismissal of such proceeding, or in the event that a receiver, trustee or like officer is appointed to take possession of a material portion of the assets of the Venturer.

7.2    **Remedies upon Default**

Upon an Event of Default, the nondefaulting Venturer shall have the following rights and remedies:

(a)    To terminate and cause the dissolution of the Joint Venture; or

(b)    To sue the defaulting Venturer for damages and/or specific performance; and/or

(c)    To exercise any other rights granted by law.

## 8.   DEADLOCKS

### 8.1   Deadlock Procedures

In the event that the Board of Directors is unable to approve a new Business Plan for the Joint Venture or the Board of Directors is deadlocked, any Venturer holding in excess of 7% of the total issued and outstanding shares of the Joint Venture may declare a deadlock by notice to the others.   Such notice shall not be delivered until after the Board of Directors has had a discussion regarding the issue.   Upon declaration of a deadlock, the matter shall be referred to the highest ranking executive of Eleutian, CDI, and Skylake (the "Officers") who shall meet personally within ten (10) days of receipt of notice of such deadlock.   If the executives are unable to resolve the deadlock issues within ten (10) days of their meeting, the provisions of Section 8.2 below shall be implemented.

### 8.2   Resolution of Deadlock

If the Venturers have not been able to resolve a deadlock in accordance with the provisions of Section 8.1 above, the following shall occur:

(a)     If   both Eleutian and SkyLake desire to sell their interests in the Joint Venture, the Joint Venture shall be sold to a third party or liquidated and dissolved and each Venturer shall be entitled to its pro rata portion of the Joint Venture's assets after provision has been made for all liabilities; or

(b)     A Venturer owning in excess of 15% of the outstanding shares may terminate the Agreement by written notice to the other Venturers, in which case the Joint Venture shall be dissolved in accordance with Section 9.

## 9.   Dissolution

### 9.1   Events of Dissolution

The Joint Venture shall be dissolved only in the event that:

(a)     an Event of Default has occurred and a nondefaulting Venturer holding in excess of 20% of the Joint Venture elects to dissolve and terminate the Joint Venture;

(b)     the Venturers mutually agree to dissolve and terminate the Joint Venture; or

(c)   the Venturers are deadlocked and the deadlock has not been resolved as provided in Section 8.

## 9.2   Management Rights during Dissolution

During the period of dissolving the Joint Venture and winding up its affairs, the rights and obligations of the Venturers set forth herein with respect to the management of the Joint Venture shall continue.   For purposes of winding up, the Venturers, acting through their representatives, shall continue to act as such and shall make all decisions relating to the conduct of any business or operations during the winding up period to the sale or other disposition of the Joint Venture assets; provided that if the termination of the Joint Venture results from an Event of Default, the Defaulter shall have no further right to participate in the management or affairs of the Joint Venture but shall nonetheless be bound by all decisions made by the Non-Defaulter.   Each Venturer hereby waives any claims it may have against the Non-Defaulter that may arise out of the management by the Non-Defaulter of the Joint Venture, so long as such Non-Defaulter acts in good faith.

### 9.2.1  Noncash Assets

Every reasonable effort shall be made to dispose of the assets of the Joint Venture so that distribution may be made to the Venturers in cash.   In the case of any assets the Joint Venture might have at the time of dissolution in the form of intangible industrial property, works in process, notes, or other noncash assets, the same shall be distributed in kind to the Venturers in lieu of cash proportionately to their right to receive the assets of the Joint Venture on an equitable basis reflecting the net fair market value of the assets so distributed, provided that distributions of intangible industrial property shall be subject to rights that may have been granted to third Venturers by the Joint Venture.

## 9.3   Disposition of Documents and Records

All documents and records of the Joint Venture, including, without limitation all financial records, vouchers, canceled checks and bank statements, shall be delivered to Eleutian upon termination of the Joint Venture.   Unless otherwise approved by the other Venturers, Eleutian shall retain such documents and records for a period of not less than three (3) years and shall make such documents and records available during normal business hours to the other Venturers for inspection and copying at the other Venturers' cost and expense.

## 10.   Enforcement

### 10.1        Severability

In the event that any provision of this Agreement, or any portion thereof, shall be held invalid, illegal or unenforceable under applicable law, the remainder of this Agreement shall remain valid and enforceable.

### 10.2     Waiver of Obligation

Any Venturer may waive or reduce in writing any obligation of or restriction upon the other under this Agreement.   No such waiver shall be deemed to constitute a waiver of any other or subsequent default or breach.

### 10.3     Specific Performance/Injunctive Relief

Nothing contained herein shall bar a Venturer's right to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will cause loss or damages, under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions.

### 10.4     Rights of Venturers are Cumulative

The Venturers' rights hereunder are cumulative and no exercise or enforcement by a Venturer of any right or remedy hereunder shall preclude the exercise or enforcement by such Venturer of any other right or remedy, hereunder or otherwise, which such Venturer is entitled by law to enforce.

### 10.5        Third Parties

Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto except those officers whose duties are governed and set forther in this agreement.

## 11.    General Provisions

### 11.1    Complete Agreement; Amendment

This Agreement constitutes the entire agreement between the Venturers and supersedes all agreements, representations, warranties, statements, promises and understandings, whether oral or written with respect to the subject matter hereof, and

neither Venturer shall be bound by or charged with any oral or written agreements, representations, warranties, statements, promises or understandings not specifically set forth in this Agreement or exhibits made hereto.   This Agreement may not be amended, altered or modified except by a writing signed by all Venturers.

### 11.2   Notices

All notices and other communications required or permitted to be given under this Agreement shall be in writing, in the English language, and shall be effective when delivered personally, or three (3) business days after being properly sent by commercial overnight carrier, or two (2) business days after being transmitted by email or facsimile transmission, or ten (10) days after being mailed if sent by registered or certified airmail postage prepaid and addressed to the Venturer at its address set forth below, unless by such notice a different person, address or number shall have been designated for giving notice hereunder:

If to Eleutian, to:

Eleutian Technology
215 2nd St.
Ten Sleep, Wyoming
Wyoming
ATTN: Legal Dept.

| | |
|---|---|
| Telephone: | 307-366-2902 |
| Attention: | Kent Holiday |
| | Manager |

If to Skylake, to:

Skylake
Daedong Building
517-4 Dogok-dong, Gangnam-gu
Seoul 135-270, Republic of Korea

| | |
|---|---|
| Telephone: | +82-2-579-5511 |
| e-mail: | kevin.choi@skylakeincuvest.com |
| Attention: | Seungwoo Kevin Choi (Managing Director) |

If to CDI:

        CDI Holdings, Inc.
        Daechi-4-dong 890-20 KTF Tower 17th Fl
        Kangnam-ku
        Seoul 135-737
        Republic of Korea

        Telephone:     +82-2.3429.9409
        Attention:      Michael Kim, Managing Director

All notices, demands, and requests shall be deemed effective upon delivery in the case of personal service or Facsimile, or in the case of registered mailing, ten (10) days after being deposited in the mails, or in the case of express mail, two (2) days after being sent via express courier.

### 11.3   Dispute Resolution

#### 11.3.1 Mediation Procedures

Mediation and arbitration procedures, as set forth in this Section 11.3.1 and Section 11.3.2, shall apply only in cases of dispute wherein a default is alleged and shall not apply to issues of Deadlock, which shall be resolved as set forth in Section 8 hereof.   In the event such a dispute arises, at the request of any Venturer holding in excess of 7% of the outstanding shares of the Joint Venture, the Venturers shall submit the disagreement to mediation by a Person agreed to by all Venturers; or in the event they are unable to agree on a mediator, to a Person appointed by the Joint Venture's Auditor.   If the matter in dispute involves financial, tax, or cost accounting issues, the Auditor shall act as mediator.   It is understood that the mediator shall not have the power to finally resolve any such disagreement, but the Venturers agree, in order to make the mediation process as effective as possible, to endeavor in good faith to resolve the disagreement through mediation, to be bound by all procedural requirements established by the mediator, and to respond to requests by the mediator to appear before him and present arguments and evidence bearing upon and supporting the position of each Venturer with respect to the particular matter in dispute.   If such matter cannot be resolved by mediation, either Venturer may submit the matter for binding arbitration.

### 11.3.2 Arbitration Procedures

In the event that any dispute cannot be settled by mediation as set forth in Section 11.3.1, all disputes, controversies, or differences which may arise between Eleutian, Skylake or the Joint Venture out of or in relation to or in connection with this Agreement, or for the breach thereof, shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "Rules") by one or more arbitrators appointed in accordance with the Rules.

(a)     The arbitration shall be held in Maui, Hawaii, and all proceedings shall be conducted and reported in the English language.

(b)     If more than one arbitrator participates in the proceeding, the arbitrators shall decide any matter before them by majority vote in accordance with this Agreement.

(c)     The arbitrators shall proceed promptly and diligently and render their decision as soon as practicable.   The decision of the arbitrators shall be in writing in English and presented in separate findings of fact and law.   The award of the arbitrators shall be final and binding on the Venturers from which no appeal may be taken, and an order confirming the award or judgment upon the award may be entered in any court having jurisdiction.   The award of the arbitrators may include pre-award interest and equitable relief to the extent the arbitrators deem appropriate.   The award shall include interest from the date of the award until paid in full, at a rate to be fixed by the arbitrators.

(d)     The arbitrators, in the award, may assess the fees and expenses of the arbitrators and the arbitration, and the witness and attorneys' fees of the Venturers, or any part thereof, against any Venturer, taking into account the circumstances of the case.

(e)     Notwithstanding the initiation of an arbitration proceeding, each Venturer shall continue to perform all duties and obligations under this Agreement, without prejudice.

### 11.4   Governing Law and Language

This Agreement is made in accordance with and shall be governed and construed under the laws of Korea; provided that to the extent that any Exhibit hereto contains its own choice of law provision, the terms of that choice of law provision shall govern and prevail over this provision with respect to any dispute under the

Exhibit in question. This Agreement has been negotiated and executed in the English language and the rules of construction and definitions of the English language shall be applied in interpreting this Agreement. Unless otherwise specifically required hereunder, all notices and other communications required or permitted under this Agreement shall be written in the English language.

### 11.5   Assignment

The rights, duties and obligations under this Agreement shall not be assignable by either Venturer without the prior written consent of the other Venturers and any attempt to do so shall be void ab initio. This Agreement shall be binding upon and inure to the benefit of the Venturers and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

### 11.6   Force Majeure

Venturers shall be liable to the other for its failure to perform any of its obligations under this Agreement during any period in which such performance is delayed because rendered impractical or impossible due to circumstances beyond its reasonable control, provided that the party experiencing the delay promptly notifies the other of the delay.IN WITNESS WHEREOF, the Venturers have executed this Agreement as of the day and year first written above.

Eleutian Technology, L.L.C.

By   _____

Title _____


Skylake Global Incuvest 1 Private Investment Specialty Co., Ltd

By   _____

Title _____

CDI Holdings, Inc.

By _____

Title _____

# EXHIBIT B



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
May 1, 2008

**INVOICE #**
060208 - EK5

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - April expenses

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - April 2008** | 238,841.53 |
|  - per April P&L | |
| **TOTAL** | $       238,841.53 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



**P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902**

**DATE:**
June 2, 2008

**INVOICE #**
060208 - EK6

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - May expense estimate

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - May 2008 estimate** | 238,841.53 |
| - estimate based on April 2008 P&L actual | |
| | |
| **TOTAL** $ | 238,841.53 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
June 15, 2008

**INVOICE #**
061508 - May reconciliation

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - May 2008 reconciliation

| DESCRIPTION | AMOUNT |
| --- | --- |
| **Eleutian US expenses - May reconciliation to actual expenses** | |
| - May actual expenses | 280,114.83 |
| - May estimate (already paid) | (238,841.53) |
| | |
| **TOTAL** | $       41,273.30 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
July 14, 2008

**INVOICE #**
061508 - June Expenses

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - June 2008 Expense Estimate

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - June 2008 estimate** | |
| - June 2008 estimate based on May 2008 actual | 280,114.83 |
| | |
| **TOTAL** | $    280,114.83 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
July 14, 2008

**Bill To:**
Eleutian Korea

**INVOICE #**
071408 - June reconciliation

**For:**
Eleutian US - June 2008 reconciliation

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - June reconciliation to actual expenses** | |
| - June actual expenses | 270,970.02 |
| - June estimate (already paid) | (280,114.83) |
| | |
| **TOTAL** | $          (9,144.81) |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
August 11, 2008

**INVOICE #**
081108 - August Expenses

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - August 2008 Expense Estimate

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - August 2008 estimate** | |
| - August 2008 estimate based on July 2008 actual | 295,313.29 |
| **TOTAL** $ | 295,313.29 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



### leutian

P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
September 16, 2008

**INVOICE #**
091608 - August reconciliation

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - August 2008 reconciliation

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - August reconciliation to actual expenses** | |
| - August actual expenses | 337,583.44 |
| - August estimate (already paid) | (295,313.29) |
| **TOTAL** | $         42,270.15 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
September 16, 2008

**INVOICE #**
091608 - September Expenses

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - September 2008 Expense Estimate

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - September 2008 estimate** | |
| - September 2008 estimate based on August 2008 actual | 337,583.44 |
| **TOTAL** $ | 337,583.44 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
November 20, 2008

**INVOICE #**
112008 - September reconciliation

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - Septmber 2008 reconciliation

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - September reconciliation to actual expenses** | |
| - September actual expenses | 454,879.28 |
| - September estimate (already paid) | (337,583.44) |
| | |
| **TOTAL** $ | 117,295.84 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
November 20, 2008

**INVOICE #**
112008 - October reconciliation

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - October 2008 reconciliation

| DESCRIPTION | AMOUNT |
| --- | --- |
| **Eleutian US expenses - October reconciliation to actual expenses** | |
| - October actual expenses | 419,420.52 |
| - October estimate (already paid) | - |
| **TOTAL** $ | 419,420.52 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



**P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902**

**DATE:**
November 20, 2008

**INVOICE #**
112008 - November Expenses

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - November 2008 Expense Estimate

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - November 2008 estimate** | |
| - November 2008 estimate based on October 2008 actual | 419,345.04 |
| **TOTAL** $ | 419,345.04 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089



P.O. Box 88  Ten Sleep, WY 82442 (307) 366-2902

**DATE:**
January 14, 2009

**INVOICE #**
011409 - December reconciliation

**Bill To:**
Eleutian Korea

**For:**
Eleutian US - December 2008 reconciliation

| DESCRIPTION | AMOUNT |
|---|---|
| **Eleutian US expenses - December reconciliation to actual expenses** | |
| - December actual expenses | 409,827.48 |
| - December estimate (already paid) | - |
| **TOTAL** $ | 409,827.48 |

**Remit to:**
First National Bank & Trust
245 E. 1st Street  Powell, WY 82435
Beneficiary: Eleutian Technology, LLC
Account # - 113514002
Routing # - 102301089

# EXHIBIT C

## ONLINE FILING DEMAND FOR ARBITRATION/MEDIATION FORM

This concludes your filing.

Thank you for submitting your claim to the AAA.

Your claim confirmation number is: 002-EIL-MZN

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your dispute has been filed in accordance with: Commercial Dispute Resolution Procedures

This Claim has Been Filed For: Arbitration

Filing Fee: $3,600.00

### Additional Claim Information

Fee Schedule: Flexible

Claim Amount: $6,000,000.00

Claim Description: Breach of Exclusive Distribution Agreement and tortious interference with contractual relations. Seeking damages of $6,000,000, plus attorney's fees and costs.

Arbitration Clause: See uploaded document.

Hearing Locale Requested: Maui , HI

Contract Date: 04/01/2008

Number of Neutrals: 1

| Claimant | Representatives |
|---|---|
| **Eleutian Technology, Inc.** | |
| Type of Business: Service / Product Provider | |

| | |
|---|---|
| Name: | Name: Matthew J Ball |
| Company Name: Eleutian Technology, Inc. | Company Name: Parr Brown Gee & Loveless, P.C. |
| Address: Po Box 88<br>Ten Sleep, WY 82442 | Address: 185 South State Street, Suite 800<br>Salt Lake City, UT 84111 |
| Tel#: 801-532-7840 | Tel#: 801-532-7840 |
| Fax#: | Fax#: 801-532-7760 |
| Email: brian@eleutian.com | Email: mball@parrbrown.com |
| Include in Caption: Company | |

| Respondent | Representatives |
|---|---|
| **Eleutian Korea, Ltd.** | |
| Type of Business: Seller | |

| | |
|---|---|
| Name: | |
| Company Name: Eleutian Korea, Ltd. | |
| Address: 30th Florr Asem Tower<br>159-1 Samsung-Dong<br>Gangnam-Gu, Seoul<br>Unknown<br>Korea, Republic of | |
| Tel#: Unknown | |
| Fax#: | |
| Email: | |
| Include in Caption: Company | |

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your demand/submission for arbitration/mediation has been received on 01/06/2011 16:43 EST

EXCLUSIVE DISTRIBUTION AGREEMENT

THIS EXCLUSIVE DISTRIBUTION AGREEMENT ("Agreement") is made effective the first day of April, 2008, by and between Eleutian Technology, LLC, a Wyoming Company ("EUS"), and Eleutian Korea, a Korean Company whose principal place of business is in Seoul, Korea ("EK").

WHEREAS, EUS is in the business of selling online English products and services; and

WHEREAS, EK shall be exclusive distributor of the EUS Products (as defined in Exhibit A hereof) within Territory in accordance with the terms and conditions of this Agreement;

NOW THEREFORE, the Parties enter into this Agreement and intend to be legally bound and agree as follows:

1.   DISTRIBUTORSHIP TERMS

1.01   Appointment and Acceptance. EUS hereby appoints EK as its exclusive distributor of Products in the Territory during the Term of this Agreement. EK accepts this appointment. During the Term of this Agreement and for a period of one hundred and eighty (180) days thereafter, EUS shall not directly or indirectly sell or offer to sell or license any Products to any third party within the Territory. In the event EUS receives requests for information relating to, or purchase orders for Products from customers or potential customers within the Territory, EUS shall promptly forward such requests or orders to EK. EK shall have the right to appoint sub-distributors with the written consent of EUS.

1.02   Products Defined. Products are those described in Exhibit A (including all modifications, new versions or replacements).

1.03   Territory Defined. The Territory is defined to be the Republic of Korea, or the country commonly called South Korea.

1.04   No Activities Outside the Territory. EK shall neither directly or indirectly sell or license Products or promote the sale of Products outside the Territory. EK shall not establish an office outside the Territory.

1.05   Foreign Teacher Defined. A Foreign Teacher is defined to be any person that is not a Korean National.

1.06   EK's Restriction on Hiring Foreign Teachers. During the Term of this Agreement and for a period of one hundred and eighty (180) days thereafter, EK shall not market, hire, sell, broker, or in any way use any Foreign Teacher or Foreign Teacher services from any organization or entity other than EUS.

2.   PRICES AND TERMS

2.01   Prices. EK shall pay EUS all actual costs of EUS operations ("EUS Costs") throughout the Term of this Agreement. EUS Costs shall include but not be limited to all cost of sales, wages, operating expenditures, capital expenditures, lease payments, rental payments, benefits, consultant fees, depreciation expense, amortization expense, corporate taxes and fees, etc. In the event a capital expenditure in excess of $75,000 for a single item needs to be made, EUS shall receive EK approval prior to making such expenditure. In the event EUS expands its business to other markets outside of the

Territory, any EUS expenditures related directly to the expansion outside of the Territory shall be borne by EUS and not be included in EUS Costs.

(i) EK shall have a right to audit the EUS expenditures which are associated with the EUS Costs. Such audit shall be performed at the EUS place of business and EK shall give five (5) days written notice of its intent to audit.

2.02. **Capacity Forecast.** On a monthly basis EUS shall provide EK with a potential teacher hour capacity forecast, broken down on total weekly teacher hours available for the following 24 weeks (Capacity Forecast). Such forecast shall not be a guarantee of teacher hour availability but shall be a good faith forecast based on current predictions.

2.03 **24 Week Rolling Sales Forecast.** On a monthly basis EK shall provide to EUS, in written form as requested by EUS, a total weekly hour sales forecast, for each of the following 24 weeks (Sales Forecast). Such forecast shall be a good faith forecast based on EK's estimate of current and future sales and EUS will expand operations to meet the Sales Forecast.

2.04 **Invoicing.** EUS shall invoice EK on the fifteenth (15th) day of each month for the previous months EUS Costs plus an initial payment for the current month equal to 100% of the previous months EUS Costs ("Initial Payment"). All invoices shall be paid by EK, via wire transfer, within five (5) days of being invoiced.

(i) On May 15, 2008, EUS shall invoice EK the EUS Costs for April. Additionally, EUS shall invoice 100% of the costs of April as an Initial Payment for May. EK shall pay that invoice on or before May 20th.

(ii) On June 15, 2008 EUS shall invoice EK the EUS Costs for May minus the Initial Payment made in May. Additionally EUS shall invoice EK for an Initial Payment for June which shall be equal to the actual total EUS Costs of May.

(iii) Each EUS invoice thereafter shall include the previous month's EUS Costs minus the Initial Payment made for that month. The invoice will also include an Initial Payment for the current month.

(iv) The final EUS invoice sent on January 15, 2017 shall not include an Initial Payment but shall simply be an invoice of the actual EUS Costs for December minus s the Initial Payment made.

2.05 **Resale Prices.** EK shall solely determine the prices at which it sells the Products in the Territory.

2.06 **Governing Document.** This Agreement, together with its Exhibits, shall supersede any conflicting or additional terms used by EUS or EK in the ordering of Products, unless such terms have been agreed to in writing by the parties.

3. **EK'S DUTIES**

3.01 **EK's Efforts.** EK shall use commercially reasonable efforts to promote the sale of Products in the Territory. EK shall not knowingly detract from the good name of EUS or the reputation of Products.

3.02   Payment of Account. EK shall promptly pay its account with EUS when due. Notwithstanding any other provision of this Agreement, failure by EK to pay invoices within 15 days of invoice being due shall be a material breach of the Agreement. All invoices not paid within 5 days of invoicing will be charged a 3% penalty and will accrue interest at 1.5% per month. In the event of non-payment, the 180 day exclusivity period of Section 1.01 may also be terminated by EUS.

3.04   Compliance With Law. EK shall comply with all laws and regulations affecting its business.

3.05   End-User data and information. EK shall comply with all reasonable requests by EUS to track end-user data and information.

3.06   Training. EK shall be responsible for training all of its personnel who promote Products so that they are knowledgeable about the Products and can adequately represent the Products.

3.07   EK's Expenses. All costs, including salaries, commissions, bonuses, mandatory contributions, taxes, vacation pay, fines, fees, payments, benefits, severance pay and other expenses incurred by EK in connection with its performance of this Agreement shall be borne solely by EK.

3.08   Technical Support. EK shall provide technical support for customers/end-users within the Territory. The support personnel shall be available 24 hours a day 7 days a week. EK shall be responsible for tier one and tier two technical support. EUS shall be responsible for tier three technical support, which is defined and limited to support which requires a change to the Products software code.

4.   OBLIGATIONS OF EUS

4.01   Compliance with Laws. EUS shall comply with the laws and regulations which govern its business.

4.02   Training. EUS shall provide training for EK's employees and sub-distributors (if allowed) relating to the use and application of the Products. Such training shall be conducted at least once per year, if requested by EK.

4.03   Support. EUS shall provide consultation to EK in a timely fashion concerning technical aspects and use of the Products as requested by EK.

4.04   Current Customer Transfer. Within five (5) days of execution of this Agreement, EUS shall transfer all current customers and accounts in the Territory to EK.

5.   TRADEMARKS

5.01   Use of EUS's Trademarks. EUS hereby grants to EK, and EK accepts from EUS, a non-exclusive, royalty-free, right and license, during the Term of this Agreement, to indicate to the public that it is an authorized distributor of the Products and to advertise only within the Territory such Products under the trademarks and trade names that EUS may adopt from time to time ("EUS Trademarks"). EK shall not alter or remove any EUS Trademarks applied to the Products by EUS. Nothing herein shall grant to EK any right, title, or interest in EUS Trademarks, subject to the foregoing limited license. Upon termination of this Agreement, EK shall cease using all trademarks of EUS.

5.02   EK's Use of Trademark. EK shall use EUS Trademarks only in the manner authorized by EUS.

6.    CONFIDENTIAL INFORMATION

6.01    Confidentiality. The parties acknowledge that by reason of their relationship to each other hereunder, each shall have access to certain information and materials concerning the other's business, plans, customers, technology, and/or products that is confidential and of substantial value to that party, which value would be impaired if such information were disclosed to third parties. Except as required in order to perform its obligations hereunder, each party agrees that it shall not use in any way for its own account or the account of any third party, nor disclose to any third party, any such confidential information revealed to it by the other party and shall take every reasonable precaution to protect the confidentiality of such information during the Term of this Agreement and for one (1) year thereafter. Each party shall advise the other whether or not it considers any particular information or materials to be confidential by marking on it "Confidential", "Proprietary" or some similar designation.

6.02    Confidentiality Exceptions. The provisions of Section 6.01 shall not apply to confidential information to the extent that:

(i)    such information was generally known or otherwise in the public domain prior to disclosure hereunder, or becomes so known subsequent to such disclosure through no fault of the receiving party;

(ii)    such information was received without restriction from a third party not under an obligation to the non-receiving party not to disclose it and otherwise not in violation of the non-receiving party's rights; or

(iii)    such information is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that the disclosing party shall provide prompt notice thereof to the non-disclosing party to enable such party to seek a protective order or otherwise prevent such disclosure.

(iv)    such information was developed independently by the parties without use of the confidential information of the disclosing party.

(v)    such information was known by a party prior to its disclosure by the other party.

6.03    Publications. Except as required by law or regulation, or as provided herein, no announcement, news release, public statement, publication, or presentation relating to the existence of this Agreement, the subject matter herein, or either party's performance hereunder (collectively, a "Publication") shall be made without the other party's prior written approval. Each party agrees to submit each Publication it proposes to make to the other party for purposes of such other party's review, comment and approval. Each party further agrees to respond as promptly as reasonably practicable and agrees that it shall not unreasonably withhold approval of such Publication. The parties agree that they shall use reasonable efforts to coordinate the initial announcement or press release relating to the existence of this Agreement so that such initial announcement or press release by each is made contemporaneously.

6.04    Use of Names. Except as provided in Section 5.01, neither party shall, without the prior written consent of the other party, use in advertising, publicity, promotional materials or otherwise, any tradename, trademark, trade device, service mark, symbol, or any abbreviation, contraction or simulation thereof owned by the other party.

7.     DISCLAIMERS OF LIABILITY

7.01    Disclaimer of Consequential Damages. NEITHER PARTY SHALL HAVE ANY LIABILITY OF ANY KIND FOR ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGES UNDER OR AS A RESULT OF THIS AGREEMENT, EVEN IF SUCH PARTY SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE. NOTHING HEREIN LIMITS ACTUAL DAMAGES RESULTINF FROM BREACH OF CONTRACT.

7.02    Survival. The provisions of this Section 7 shall survive any termination or expiration of this Agreement.

8.     TERM AND TERMINATION

8.01    Term. The term of this Agreement shall begin April 1, 2008, and end on December 31, 2016, subject to earlier termination as described below in this Section 8 or above in Section 3.02 ("Term").

8.02    Termination For Fault With Right To Cure. Either party may terminate this Agreement prior to its normal expiration in the event the other party materially breaches its obligations under this Agreement by giving the breaching party written notice describing the breach in detail and giving the breaching party sixty (60) days to cure the breach. If the breach has not been cured within the sixty days notice period, then the party giving notice of breach may immediately terminate the Agreement.

8.03    Effect of Termination or Expiration. Upon termination or expiration of this Agreement:

(i)    Neither party shall be released from the obligation to make payment of any and all amounts due and payable pursuant to this Agreement, including but not limited to those then due and thereafter to become due.

(ii)    The rights of each party against the other which may have accrued up to or after the date of such termination or expiration, and the provisions of this Agreement that are by their nature continuing (including but not limited to respective obligations regarding non-use and non-disclosure under Section 6.1) shall remain in force after the termination or expiration of this Agreement.

(iii)    It is expressly understood and agreed that the termination rights set forth in this Agreement are absolute and that the parties have considered the possibility of the making of expenditures by one or both of the Parties hereto in preparing for and in the actual performance of this Agreement and have considered the possibility of loss and damage resulting from the non-renewal or termination hereof. It is the express intent and agreement of the Parties that neither shall be liable to the other for damages or otherwise by reason of the non-renewal of this Agreement or its termination as provided in this Section 8, provided that such non-renewal or termination shall not operate to discharge or release either party of obligations assumed by it prior to such non-renewal or termination.

(iv)    Neither party shall be liable to the other for damages or otherwise by reason of the termination of this Agreement as provided in this Section 8. The parties agree that, subject to the provisions of this Agreement that are by their nature continuing, and without prejudice to any other remedies at law or in equity that either party may have in respect of any breach of this Agreement, neither party shall be entitled to or claim that it is entitled to any compensation or like payment as a result of or arising out of any termination in accordance with this Section 8, whether claimed as loss of goodwill, foregone profits, lost investments, or otherwise.

8.04    Bankruptcy. THE PARTIES INTEND FOR THIS AGREEMENT AND THE RIGHTS GRANTED HEREIN TO COME WITHIN SECTION 365(n) OF THE U.S. BANKRUPTCY CODE AND, NOTWITHSTANDING THE BANKRUPTCY OR INSOLVENCY OF EUS, THIS AGREEMENT AND THE RIGHTS GRANTED HEREIN SHALL REMAIN IN FULL FORCE AND EFFECT SO LONG AS EK IS IN MATERIAL COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

9.      GENERAL PROVISIONS.

9.01    Notices. Any notice, request, or other document to be given to a Party under this Agreement shall be in writing and A) sent by registered or certified mail, postage prepaid, B) hand delivered, C) sent by express mail or other overnight delivery service which provides documentation of receipt, or D) sent by telecopy, telex or telegram, addressed as follows:

If to EK:

Eleutian Korea.

_____

_____

If to EUS:

Eleutian Technology, LLC
215 N. Second St.
Ten Sleep, WY
Attn: Office of Chief Legal

And shall be labeled: "Official EK Contract Notification Enclosed"

Any party may change its address for receiving notices, requests or other documents by giving written notice of the change to the other party.

9.02    Entire Agreement. The Exhibits referred to in this Agreement are considered to be part of this Agreement. This Agreement contains the entire agreement between the Parties with respect to its subject matter and supersedes all previous agreements and understandings, whether written or oral between the parties regarding its subject matter.

9.03    No Oral Modification. This Agreement may not be modified except in writing signed by an officer of the Parties.

9.04    No Implied Waivers. The failure of one Party to require performance by the other of any provision of this Agreement shall not affect the right to require performance at a later time. The waiver by one Party of a breach by the other of any provision of this Agreement shall not be a waiver of any later breach of the provision.

9.05    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns. EK may not assign this Agreement, without EUS's consent. EUS may assign this Agreement, without EK's consent, to any subsidiary or affiliate of EUS.



EUS's rights and obligations under this Agreement shall automatically transfer in connection with a merger, consolidation, reorganization involving EUS or sale of substantially all of EUS's assets. Any attempted assignment in violation of this provision shall be null and void ab initio.

9.06    Relationship of Parties. Neither Party has the authority to bind the other.

9.07    Severability. In the event that any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provisions of this Agreement.

9.08    No Goodwill. The Parties recognize that the creation of goodwill in the market is based upon the high quality of EUS's Products and EK's domestic advertising and marketing. No claim for goodwill may be made by either party.

9.09    Force Majeure. Non-performance by either party hereunder, other than an obligation to pay money, shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts, orders or restrictions, power shortages, war in Korea or the United States, or any other reason to the extent that the failure to perform is beyond the control of the non-performing party given the non-performing party has made reasonable preparations for minor abnormalities.

9.10    Headings. The Section headings contained in this Agreement are for reference purpose only and shall not affect in any way the meaning or interpretation of this Agreement.

9.11    Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Wyoming without regard to such state's principles of conflicts of law. The Parties agree that any dispute regarding or touching this Agreement or the business relationship between the Parties shall be subject to and shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association ("AAA") rules for commercial arbitration then in effect. Such arbitration shall occur in Maui, Hawaii.

9.12    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

9.13    SDU Revenue. In April 2008, EK shall invoice Seoul Digital University for students using the Products in March, April and May 2008. EK shall remit one-third of that payment to EUS to compensate EUS for the March usage and support.

9.14    M-learning training. EK shall pay EUS the cost of CDI M-learning training of EUS employees in March. The costs associated to the trainings shall be invoiced on or before May 15, 2008.

To evidence their agreement the Parties have signed below.

Mr.  *Kent Holiday*
Member EUS

Mr.  *Seunqwoo Kevin Choi*
Chairman EK

EXHIBIT A

PRODUCTS DEFINITION

Products Shall Include:

1) SpeakENG Software Combined with Teacher Services

   a. SpeakENG software consist of one of the following Courses, existing as of the signing date of the agreement together with any updates or upgrades that EUS may make during the Term of this Agreement (provided that EUS shall not be obligated to make any updates, or upgrades to such programs): SpeakENG Kids Beginnings Course, SpeakENG Kids level 1 Course and SpeakENG Kids level 2 Course, and SpeakENG Courses 99, 101, 102, 201, 301, 302, 303

2) SpeakENG Workbooks

3) SpeakENG Placement Exam

# EXHIBIT D

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement"), made and entered into this __1__th day of January, 2011, by and between **SkyLake Incuvest & Co.,** a Korean corporation having its principal place of business at 517-10 Dogok-dong, Gangnam-gu, Seoul, Korea (the "Company"), and **SkyLake Advisors U.S.A,** a sole proprietorship owned and operated by Don Soo Suh, a U.S. resident with his address at 3003 North 1st street, #214, San Jose, CA. 95134 (the "Consultant").

~~WITNESSETH~~

WHEREAS, the Company wishes to receive consulting services from Consultant from time to time and Consultant is willing to provide such consulting services, and Company and Consultant wish to enter into this Agreement to set forth the terms and conditions on which services will be provided.

NOW, THEREFORE, the Company and Consultant hereby mutually covenant and agree as follows:

1. <u>Engagement of Consultant.</u>   Consultant is hereby retained by the Company, and Consultant hereby accepts such retainment, as a general advisor and consultant to the Company for the compensation and on the terms and conditions hereinafter expressed. Consultant shall perform such consulting duties as are reasonably assigned to him by the Company in regard to the business of the Company and its affiliates ("Services"). Services will include Consultant's advice, counsel and assistance to be furnished at the reasonable request of the Company from time to time in connection with (i) business expansion into the United States of the companies in which the Company (or the funds managed by the Company) has invested or is considering to invest, (ii) sourcing of potential investment target companies in the United States, (iii) other general matters related to the conduct of the Company's business. Services to be performed by Consultant may require up to 50% of Consultant's time.

2. <u>Consultant's Duties.</u>   Consultant will make himself available for general consultation at all reasonable times by telephone or correspondence, or meetings in the United States on mutually-agreed dates. The Company agrees to give Consultant reasonable notice of what Services it desires and when it desires them to be performed. In that connection, the Company and Consultant agree to cooperate in resolving any scheduling problems that may arise with respect to Consultant being available at the times requested.

3. <u>Compensation for Services.</u>   The Company agrees to pay to Consultant a monthly fee of ⁝           ⁝e "Fee") on the 12th day of each month <u>falling within</u> the Term. The Company agrees to pay to Consultant special <u>fee of KRW</u>           (the "Special Fee") once within the Term and additionally up to KRW           within the Term.

In addition to the Fee, the Company shall reimburse Consultant for all valid out-of-pocket expenses approved by the Company, which shall be reimbursed to Consultant.   The Company may provide Consultant with a corporate credit card for this purpose.



4. <u>Term</u>.   The term of this Agreement (the "Term") shall begin as of January 1, 2011 and remain valid for one (1) year; provided that it may be extended by mutual agreement in writing for additional one-year terms and may be terminated during the Term as provided in Section 6 hereof.

5. <u>Duties of Consultant Relating to Consulting Services</u>.   Consultant shall at all times be acting and performing hereunder as an independent contractor. In connection with the performance by Consultant of Services, the Company shall not have or exercise any control or direction over the Services performed by Consultant, and will not in any way supervise or control his activities. Consultant shall perform all of the Services herein provided for relying on his own experience, knowledge, judgment and techniques. Consultant shall not, in the performance of his duties, be managed or advised concerning the same by the Company. Consultant will not be acting as the employee, agent, partner, servant or representative of the Company, and Consultant will not have any authority to bind the Company or any subsidiary of the Company in any manner.

6. <u>Termination of Agreement</u>.   Notwithstanding that the Term shall not have been completed, the Company may terminate this Agreement (a) upon the death of Consultant, (b) if Consultant should be incapacitated by illness or any other matter from performing his duties hereunder for a continuous period of sixty days, or (c) for cause by delivery by the Company to Consultant of notice specifying such cause. If this Agreement is terminated, the Company shall only be obligated to make payments of Fee due on a pro rata basis to the date of termination.

7. <u>Confidential Information</u>.   Consultant agrees that, during the Term and at all times after the termination of this Agreement for whatever reason, he will treat as confidential and maintain in confidence all information relating to (i) the business of the Company or (ii) investment target companies and investment strategies relating thereto. In addition, Consultant agrees that, without the prior written approval of the Company, he will not disclose any such information at any time to any person, corporation, association or other entity except authorized personnel of the Company or a subsidiary of the Company. Upon the termination of this Agreement for any reason, Consultant will not take or retain from the premises of the Company or any subsidiary of the Company any records, files or other documents, or copies thereof, relating in any way to the business operations of the Company or any subsidiary of the Company.

8. <u>Assignability</u>.   The Company shall have the right to assign this Agreement to any subsidiary of the Company and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by or against said assigns. The rights, benefits and obligations of Consultant under this Agreement are personal to him, and no such rights, benefits or obligations shall be subject to voluntary or involuntary alienation, assignment or transfer.

9. <u>Governing Law; Consent to Jurisdiction</u>.   This Agreement shall be deemed to have been made under, and shall be construed and interpreted in accordance with, the laws of Republic of Korea, without giving effect to its choice of law rules. The parties hereby submit to the exclusive jurisdiction of Seoul Central District Court.



10. <u>Inconsistent Obligations</u>.   Consultant represents and warrants that, at the date of this Agreement, he has no obligations that are inconsistent with those of this Agreement.

14. <u>Sole Agreement</u>.   All prior negotiations and agreements between the parties hereto relating to the transactions, employment and services contemplated hereby are superseded by this Agreement, and there are no representations, warranties, understandings or agreements with respect to such transactions, employment or services other than those expressly set forth herein.

IN WITNESS WHEREOF, the Company and Consultant have executed this Agreement as of the day and year first above written.

Consultant

By: _____
Don Soo Suh
SkyLake U.S.

서울특별시 강남구 포곡동 517-10 4층
스카이레이크 인큐베스트(주)
대표이사 진 대 제
Daeje Chin, Ph.D.
President & CEO

Jan. 13th. 2011